TRINA A. HIGGINS, United States Attorney (#7349)
CARL D. LESUEUR, Assistant United States Attorney (#16087)
AARON B. CLARK, Assistant United States Attorney (#15404)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone:  (801) 524-5682
Email:  carl.lesueur@usdoj.gov

---

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:20-cr-285 |
| Plaintiff, | |
| vs. | |
| ABIEMWENSE VALENTINE OBANOR, | Judge Robert J. Shelby |
| Defendant. | |

**UNITED STATES' POSITION ON SENTENCING FACTORS**
**UNDER 18 U.S.C. § 3553**

INTRODUCTION ............................................................................................................. 1

LEGAL STANDARDS ................................................................................................... 1

ANALYSIS...................................................................................................................... 1

   I.   The Nature and Circumstances of the Offense ......................................................... 1

      A.   A Complex and Extensive Web of Fraud and Money Laundering ................... 1

         1.   The Fraud Scheme Relied upon Nigeria-Based "Yahoo boys" and U.S.-Based "Pickers"  2

         2.   The Fraud Targeted Vulnerable Women........................................................... 3

         3.   The Scope of the Conspiracy and Defendant's Participation............................ 4

      B.   Victim Impact .................................................................................................... 4

   II.   History and Characteristics of the Defendant ......................................................... 5

   III.   Sentencing Purposes................................................................................................ 5

      A.   Reflect Seriousness of the Offense, Promote Respect for the Law, & Provide for Just Punishment ...................................................................................................... 5

      B.   Afford Adequate Deterrence .............................................................................. 6

      C.   Protect the Public from the Defendant ............................................................... 6

      D.   Provide the Defendant Education, Treatment, or Training ................................ 6

   IV.   Sentences Available ............................................................................................... 7

      A.   Up to 20 Years' Imprisonment .......................................................................... 7

      B.   Up to 3 Years' Supervised Release .................................................................... 7

      C.   Fine of Up to $250,000 or Twice the Gain or Loss .......................................... 7

   V.   Guidelines Sentences and Range............................................................................. 7

   VI.   Need to Avoid Unwarranted Sentencing Disparity............................................... 8

   VII.   Restitution............................................................................................................. 9

CONCLUSION................................................................................................................ 10

**INTRODUCTION**

Defendant Abiemwense Valentine Obanor was part of a group of individuals who came to the United States from Nigeria on student visas, only to embark on a campaign of exploiting and defrauding widows and lonely women and laundering the proceeds of those crimes. Defendant was not someone who interacted directly with victims, but instead helped supply United States based accounts to his associates to provide to the victims, for the purpose of helping prevent the victims from learning they were sending money to Nigeria. The United States recommends a sentence of imprisonment, to be followed by three years supervised release, and an order of restitution of $2,219,802.97.

**LEGAL STANDARDS**

The factors discussed below are to be considered at sentencing pursuant to 18 U.S.C. § 3553. The Federal Rules of Evidence do not apply at sentencing. Fed. R. Evid. R. 1101(d). When facts relevant to sentencing are in dispute, the government bears the burden of proof by a preponderance of the evidence. *United States v. Rodriguez-Felix*, 450 F. 3d 1117, 1131 (10th Cir. 2006).

**ANALYSIS**

I.      **The Nature and Circumstances of the Offense**

A.  **A Complex and Extensive Web of Fraud and Money Laundering**

Defendant participated in a romance fraud scheme and money laundering. The purpose of the scheme is to get money from victims by creating online profiles pretending to be a United States soldier, international businessmen, or some other seemingly attractive profile, and using those profiles to develop relationships with victims. The scheme involves (i) conspirators who create the fake online accounts and communicate with victims ("Yahoo boys"); (ii) conspirators who open bank accounts in trusted jurisdictions such as the U.S ("Pickers"); (iii) coordinators

who supervise the online impersonators and have contacts with the money movers.  The

participants frequently refer to these romance schemes as "dating work," or, when using a

celebrity identity, "celebrity work."

> 1.  The Fraud Scheme Relied upon Nigeria-Based "Yahoo boys" and U.S.-Based "Pickers"

The fraud scheme divided its operations as follows.  So-called "Yahoo boys" in Nigeria

communicated with the victims.  So-called "pickers" in the United States supplied U.S.-based

accounts to help in the deception, and took the money from the victims.  These U.S.-based

participants would then launder those proceeds and send them to Nigeria.

This division of operations helped create plausible deniability for all involved.

Participants in Nigeria never provided personal information or identifiers to victims.  Participants

in the United States could deny knowledge of and involvement in victim communications.  This

allowed both to claim innocent belief that the funds they received were from family or

acquaintances or some business operation.

U.S.-based coconspirators not only helped divide operations to attempt to thwart law

enforcement, but they were also critical to executing the fraud.  The U.S. based coconspirators

were the ones who collected the money from the duped victims.  They also provided U.S. based

accounts and addresses to help perpetuate the fraud.

The Yahoo boys would develop an online relationship with the victims through electronic

communications. In those communications, they would attempt to convince the women that the

Yahoo boys were U.S. military officers or businessmen with U.S. ties, who intended to marry the

women, all without disclosing that the Yahoo boys were truly in Nigeria.  They would groom the

victims, coaxing them to send smaller sums to help with a gift or medical payment for a family

member.  Eventually they would persuade victims to send large sums.  The guise was sometimes

to help the fake persona to travel, get out of a dangerous situation, or complete a project that would yield a high return for the victim.

But the Nigerian based participants could not themselves collect the money from the victims.  They needed someone with a U.S. based account or address to collect the money.  This was the role of the U.S. based "pickers."  The pickers would provide U.S. based accounts to help trick the victim and to receive the funds.  Obviously, the object of the fraud could not be realized without the help of the pickers, who provided Yahoo boys with account information to receive victims' money, which the Yahoo boys in turn relayed to the victims.  The victims would then send the funds to the pickers' accounts or addresses.  The pickers would then use their own network to move the funds and distribute to the Nigerian accounts of the scheme's participants.  The Yahoo boys, pickers, and coordinators send evidence and details of transactions to each other through electronic communications in an attempt to ensure no one attempts to abscond with more than their agreed share of the fraud proceeds.

## 2.  The Fraud Targeted Vulnerable Women

The very nature of the fraud scheme suggests its intended targets are emotionally vulnerable women.  The Yahoo boys typically created profiles of men in their late fifties and early sixties.  In other words, they were primarily targeting women in a later stage of life, not newlyweds or young single adults.  The persons most susceptible to such romance scams and with the most cash at their disposal are emotionally vulnerable:  widows, divorcees, and women in troubled relationships or difficult circumstances (immigrants or serious illness).  Consistent with that, interviews of many victims indicated a large number of the victims were widows over the age of sixty.  Anyone with any understanding of the nature of the fraud either knew or should have known that it targeted these vulnerable women.

3

### 3.   The Scope of the Conspiracy and Defendant's Participation

The defendants in this indictment were a group of United States based pickers.  In all, this group of eight Utah based "pickers" who conspired together, took in more than $2 million into their accounts, including cash, wire, and checks that appear to be from approximately 195 victims.[1]  The Defendant participated for approximately 16 months.  The offenses included securing and using false passports to use to open accounts to receive money from victims and relay it through layers of money laundering.  The Defendant personally moved approximately $850,000 through accounts he personally controlled in his own name and his "Alan Tony Celu" alias.

## B.  Victim Impact

This conspiracy had a devastating impact on many of the victims, financially, emotionally, and socially.  The United States shares here one example from the 195 victims.

C.M. lost her husband in January 2019.  They ran a family farm.  She went to an online group for widows for support in her grief.  She met someone who claimed to be a widower named Tyler Joseph Woodgate.  He aggressively courted her through electronic communications and the telephone.  A friend performed some research to try to validate his identity, but was unconvinced. C.M. confronted "Woodgate" with his lack of online presence consistent with a real person. "Woodgate" claimed he had been a victim of identity theft, and the FBI helped erase all of the online information about him.  They continued to correspond.  He convinced her he was an oil rig worker. He told her he needed to borrow money for his job, which he would repay.  C.M. took out money from their farming line of credit.  She sent the money to "Randy Mensah" and "Michael Sankah,"

---

[1] The United States compiled this information from approximately 50 accounts opened by the eight defendants named in the indictment, in their own true names or aliases.  Records of these accounts and transactions have been included in the discovery materials provided to the Court.  The summary of this information is being presented by way of proffer, and, to the extent there is any dispute of the accuracy of this summary, can be presented through testimony of FBI Analyst Angela Mennitt at sentencing.

false identities used by one of the Defendant's roommates and coconspirators. She ultimately determined she was being defrauded. She has not shared this information with her sons and is terrified to admit to them she used the family farm's line of credit.

## II.   History and Characteristics of the Defendant

Otherwise, there is nothing so significant or unusual about his history or characteristics that it moves his sentence one direction or another. Defendant told the pretrial services officer that he attended UVU until 2019. In truth, the Defendant enrolled in classes for one semester in Spring of 2018, but withdrew from all his classes. It appears he embarked immediately on his course of criminal conduct. It suggests that his sole reason for emigrating to the United States was to participate in criminal conduct. Similarly, it seems his sole purpose in departing to Canada after his associates were arrested was to escape responsibility for that conduct.

## III.   Sentencing Purposes

### A.   Reflect Seriousness of the Offense, Promote Respect for the Law, & Provide for Just Punishment

Defendant engaged in a deliberate, persistent course of criminal conduct over an extensive period, beginning as early as April 2018 and continuing until April 2020. He engaged in concerted conduct with others, magnifying their individual efforts and the harm they caused. Conspiracies are particularly harmful in that coconspirators encourage and enable each other to break the law. His conduct harmed many people. His sentence should reflect that harm.

He also obtained false identification documents, which he presented to banks and used to facilitate the fraud and money laundering. He also fled to Canada after learning of the arrest of his associates. These factors suggest a sentence of imprisonment is necessary to help instill respect for the law.

### B.  Afford Adequate Deterrence

Deterrence is a particularly important consideration in an activity like this that involves significant planning, coordination, and execution over a significant period of time.  This group of "pickers," including the Defendant is part of a larger loosely affiliated group of participants in these crimes.  It is estimated that internet crimes including the types facilitated by this group of pickers (romance scams, advance fee, business email compromise) caused more than $1.5 billion dollars in losses in the United States in 2018.[2]  It is not uncommon for participants in these kinds of crimes to monitor the actions of law enforcement against "Yahoo boys" and their associates. Accordingly, there is reason to believe that a sentence of imprisonment will help concerns of general deterrence.

### C.  Protect the Public from the Defendant

The Defendant poses a particular threat to the public in that he takes steps to conceal his participation.  His activities are largely conducted online, and he has shown a willingness to use false identification documents to conceal his participation.  For instance, Mr. Obanor is believed to have obtained and used false identification documents in the names of "Napoleon Wilson," "Michael Serge," and "Warren McKinney."

### D.  Provide the Defendant Education, Treatment, or Training

The United States is unaware of any particular education, treatment, or training the Defendant requires.  This factor does not weigh one way or the other in the United States' recommendation.

---

[2] FBI 2018 Internet Crime Report at p. 20 *available online at* https://pdf.ic3.gov/2018_IC3Report.pdf.

IV.      **Sentences Available**

For this offense, the law provides for a sentence of imprisonment of no more than

20 years, a fine that is the greater of $250,000 or twice the loss amount, and a period of

supervised release of up to three years may be imposed.

A.   **Up to 20 Years' Imprisonment**

The United States' recommended sentence is well below the statutory maximum in this

case.

B.   **Up to 3 Years' Supervised Release**

The United States recommends 3 years' supervised release.  Defendant has a wife and a

child, and intends to seek asylum.  Though his conviction might make him generally deportable

and ineligible for reentry, there remain grounds to apply for withholding of removal.[3]  Under

these circumstances, a sentenced of supervised release following imprisonment is appropriate.[4]

C.   **Fine of Up to $250,000 or Twice the Gain or Loss**

The United States does not recommend a fine.  There is presently no reason to believe

Defendant will have ability to pay both a fine and restitution to the victims of his crimes.  Any

funds that would be applied toward a fine should be paid to victims in restitution instead.

V.       **Guidelines Sentences and Range**

The United States does not object to the guidelines calculations reflected in the

presentence investigation report.

---

[3] Specifically, there is a process for obtaining waivers of the ineligibility on grounds of extreme hardship to a relative (such as a spouse or child).  *See, e.g.* U.S. Citizenship and Immigration Services, Policy Manual, Vol. 9 Part B Chapter 4 (available online at https://www.uscis.gov/policy-manual/volume-9-part-b-chapter-4).  In addition, a felony does not necessarily make one ineligible to apply for asylum.

[4] *See United States v. Gutierrez-Carranza*, 604 Fed. App'x 750, 751 (10th Cir 2015) (unpublished decision) (supervised release for deportable alien may be appropriate where he has a wife and children in the country or a history of violation of deportation orders or immigration violations).

VI.       **Need to Avoid Unwarranted Sentencing Disparity**

The sentencing guidelines are intended to account for and reduce disparities in sentencing by taking into account the specific facts and circumstances of each defendant in a consistent manner.  The lengths of the recommended sentences is within the range reflected by other sentences imposed in similar crimes during the last couple years.  Of course, not all the facts and circumstances affecting each individual's sentence is publicly known.  But here are examples of some of the publicly reported sentences handed down this year involving those receiving and laundering scam proceeds, including romance scams:

- *United States v. Mensah, et al.*, (S.D.N.Y.)—On July 1, 2021, the defendant Mensah was sentenced to 70 months' imprisonment for her role in a money laundering conspiracy.  She recruited and directed another co-conspirator on how to set up business bank accounts in the scam.  In total she and at least four co-conspirators received and laundered about $10 million, comprising proceeds from both business email compromise and romance scams.  Prison sentences for four codefendants were previously issued in the amounts of 51 months, 48 months, 30 months, and 15 months.

- *United States v. Onoimoimilin*, (W.D. Tex.)—On July 7, 2021, the defendant was sentenced to 87 months' imprisonment for his participation in a money laundering conspiracy involving romance scams and business email compromise scams.  In total, the conspiracy received and laundered about $2.2 million.  Defendant received between 10 and 15% of more than $420,000 of fraudulently obtained funds that he also laundered.

- *United States v. Ojedokun*, (D. Md.)—On March 11, 2021, the defendant who was convicted by a jury was sentenced to 108 months' imprisonment for his role in romance scams and money laundering.  Total losses were in the millions.  Previously convicted coconspirators received sentences between a year and a day and 234 months in federal prison.

- *United States v. Annor*, (D. Md.)—On October 29, 2021 two brothers who entered guilty pleas for their roles in a conspiracy to receive and launder $6.2 million in proceeds from romance scams were sentenced to 36 months' imprisonment and 20 months' imprisonment, respectively.

- *United States v. Adebara*, *et al.* (N.D. Ok.)—On September 10, 2021, the defendant, who pleaded guilty for his role in receiving and laundering proceeds of romance scams, was sentenced to 48 months' imprisonment. The scheme caused losses of approximately $2.5 million in total.  Five other codefendants

8

who pleaded guilty were sentenced to 33 months' imprisonment, 12 months' imprisonment, 10 months' imprisonment, 8 months' imprisonment, and time served.

- *United States v. MgBodile*, (N.D. Ga.)—On November 19, 2021, the defendant was sentenced to 156 months' imprisonment after being convicted by a jury for his role in receiving and laundering funds from a variety of fraud schemes, including a romance scam that defrauded one woman out of more than $5 million.  He directed others to open fraudulent business bank accounts that received millions from the fraud schemes, and then he and others laundered those funds.

- *United States v. Okpako*, (M.D. Pa.)—On November 24, 2021, the District Court for the Middle District of Pennsylvania sentenced Jabin Okpako to 87 months' imprisonment for his role in romance schemes.  Specifically, his coconspirators employed romance scams to induce victims to provide approximately $1.9 million to Okpako, who then laundered those proceeds.

## VII.    <u>Restitution</u>

The parties agreed as part of the plea agreement pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure that Defendant would pay $2,219,802.97 to victims, and would be jointly and severally liable with his codefendants for this repayment.  This represents the total loss experienced by the victims as a result of the conspiracy.  The United States respectfully submits that, given the Defendant's knowledge of the number of participants in the conspiracy, and the volume of transactions he personally oversaw, this amount was within the scope of the conspiracy and reasonably foreseeable to him.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court enter a

sentence of imprisonment, three years supervised release, and restitution in the amount of

$2,219,802.97, to be paid joint and severally with his codefendants.

Dated: August 10, 2022
      Salt Lake City, Utah             Respectfully,

            TRINA A. HIGGINS
            United States Attorney

            *Carl D. LeSueur*
            CARL D. LESUEUR
            Assistant United States Attorney